JOHN C. BEIERS, COUNTY COUNSEL (SBN 144282)
By: David A. Levy, Deputy (SBN 77181)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA 94063
Telephone: (650) 363-4756
Facsimile: (650) 363-4034
E-mail: dlevy@co.sanmateo.ca.us

Attorneys for Defendant
FRANK KASTELL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| GARY ARDEN, | Case No. C 10-0436 NC |
|---|---|
| Plaintiff, | **MOTION OF DEFENDANT FRANK KASTELL FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHOTITIES IN SUPPORT THEREOF** |
| vs. | |
| FRANK KASTELL, et al., | |
| Defendants. | **Date:** November 30, 2011<br>**Time:** 9:00 a.m.<br>**Courtroom:** A, 15th Floor |

# **TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION ..................................................................................................................3

II. STATEMENT OF THE CASE................................................................................................8

III. DISCUSSION .........................................................................................................................9

    A.    Detective Kastell is Entitled to Summary Judgment, as he did not Arrest Plaintiff, and he had Good Cause to Detain and Question Plaintiff, and to Confiscate the Proceeds of Plaintiff's Crime and to take the Airport Security Badge and Employer's Equipment which, if it Remained in Plaintiff's Possession, Could Jeopardize Security at the Airport................................................................................10

    B.    Even Assuming that Plaintiff was Arrested or Detained Without Probable Cause, Detective Kastell is Protected by Qualified Immunity Because his Actions were Neither Contrary to Clearly Established Law nor Unreasonable....................................12

IV. CONCLUSION......................................................................................................................13

**TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)..........................................................................................................9

*Bradley v. Harcourt, Brace & Co.*
    104 F.3d 267 (9th Cir. 1996) ..........................................................................................10

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986).....................................................................................................9, 10

*Chandler v. Miller*
    520 U.S. 305 (1979)........................................................................................................11

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*
    391 U.S. 253 (1968)..........................................................................................................9

*Galvin v. Hay*
    374 F.3d 739 (9th Cir. 2004) ..........................................................................................12

*Hunter v. Bryant*
    502 U.S. 224 (1991)........................................................................................................12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986)........................................................................................................10

*Nat'l Indus., Inc. v. Republic Nat'l Life Ins. Co.*
    677 F.2d 1258 (9th Cir. 1982) ........................................................................................10

*Nat'l Treasury Employees Union v. Von Raab*
    489 U.S. 656 (1989)........................................................................................................11

*Orin v. Barclay*
    272 F.3d 1207 (9th Cir. 2001). ..................................................................................10, 11

*Schroeder v. McDonald*
    55 F.3d 454 (9th Cir. 1993) ............................................................................................12

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*
    809 F.2d 626 (9th Cir. 1987) ............................................................................................9

*United States v. Martinex-Fuerte*
    428 U.S. 453 (1976)........................................................................................................11

*United States v. Smith*
    790 F.2d 789 (9th Cir. 1986) ..........................................................................................10

1 **FEDERAL RULES OF CIVIL PROCEDURE**

2 Rule 56 ................................................................................................................................3, 9

3

4 **FEDERAL STATUTES**

5 42 U.S.C. §1983 .........................................................................................................................3

6

7 **CALIFORNIA STATUTES**

8 **California Penal Code**

9 §847(b)(1)) ..............................................................................................................................12

10

   §503 .........................................................................................................................................12

**NOTICE OF MOTION AND MOTION**

TO:  PLAINTIFF GARY ARDEN AND HIS ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that on Wednesday, November 30, 2011 at 9:00 a.m., or as soon thereafter as the matter can be heard in Courtroom A, 15th Floor, of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California, defendant Frank Kastell will, and hereby moves for Summary Judgment, alternatively Summary Adjudication of Issues on the grounds that he is entitled to Judgment as a matter of law on all of Plaintiff's claims.  This Motion is based on Rule 56 of the Federal Rules of Civil Procedure, this Notice of Motion and Motion, the Memorandum of Points and Authorities below, the Declarations of  Frank Kastell, Sharron Lee, Larry Needham and John Corkery In Support Of Detective Kastell's motion, the pleadings and papers on file in this matter, and such further argument as may be offered at the hearing.

**MEMORANDUM OF POINTS AND AUTHORTIES**

**I.     INTRODUCTION**

The issue in this case is whether two detectives who observe plaintiff for more than two hours pocketing money earmarked for his employer have probable cause to detain that individual, and when the District Attorney opts not to continue a criminal prosecution for embezzlement, is the lead detective liable for violation of that individual's Federal Civil Rights pursuant to 42 U.S.C. §1983.  Defendant and moving party Frank Kastell submits that the answer is "no", and he is entitled to summary judgment as a matter of law.

The case arises out of incidents occurring at San Francisco International Airport ("SFO") in early 2009. Defendant Frank Kastell has been employed as a Deputy Sheriff by the San Mateo County Sheriff's office for nearly 41 years. He has been stationed as a Detective for the Sheriff at SF0 since approximately 1990.  (Declaration of Frank Kastell, ¶1.)  The Sheriff's office is one of several police jurisdictions who have law enforcement responsibilities at SFO.  Plaintiff Gary Arden was employed as an "Assistant Terminal Manager" for Smarte Carte at SFO;  Smarte Carte rents luggage carts from automated cart dispensing units ("units") throughout SFO (and other airports throughout the world).  The units are designed so that patrons can insert cash or credit cards to rent a luggage cart by him or herself. (Declaration of Larry Needham, ¶3.)  In February 2009, Mr. Arden worked in the late afternoon until

1  midnight, and his responsibility was to walk through the entire airport, to see that operations were
2  running smoothly.  There were approximately 120 cart dispensing units located throughout SFO, located
3  at curbside on the upper (departing) and lower (arrival) levels of the three terminals, as well as inside the
4  terminals, and also on various floors of the different onsite parking garages.  (Declaration of Larry
5  Needham, ¶2.)  There were also a number of Smarte Carte "associates" working throughout the airport;
6  their primary role was to find loose carts, and insert them into the various units, and make sure that no
7  units in the area for which the associates were responsible had insufficient carts available for patrons who
8  sought to rent a cart from those units.  Plaintiff's primary duty was to make sure that the associates were
9  doing their jobs properly; to that end he was expected to be constantly moving throughout the terminals,
10 both inside and outside, on both levels.  (Declaration of Larry Needham, ¶2.)

11      The units were designed such that patrons could not take a cart from the unit without depositing
12 $4.00 in currency, or inserting a credit card.  (If a larger bill were inserted, the unit would automatically
13 dispense change in quarters.)  However in February 2009, employees could remove carts from the units
14 either by inserting a special round key, or by use of a special plastic card (like a credit card) which
15 Smarte Carte referred to as a "gold card."  Prior to February 2009, Smarte Carte Assistant Terminal
16 Managers had keys which enabled them to directly open the cashbox located in each unit. (Declaration of
17 Larry Needham, ¶3.)

18      Approximately a month earlier three of plaintiff's colleagues, also Assistant Terminal Managers,
19 had been observed opening the cash box in at least one unit in the departure (upper) level of the
20 International Terminal, and stealing money which had been deposited by customers renting the carts.
21 Detective Kastell was involved in a portion of the investigation which resulted in the eventual arrest of
22 the three individuals. (Declaration of Frank Kastell, ¶2.)  There was eyewitness observation of this
23 activity, and eventually it was also confirmed by a security camera, which was located approximately 50
24 feet away from the unit.  The camera was installed by SFO security, and the video could be accessed by
25 certain San Francisco Police Department personnel, as well as certain airport security personnel (but not
26 by Detective Kastell or his colleagues at the Sheriff's office.)  (Declaration of Frank Kastell, ¶17.)  Like
27 many security cameras, it was not specifically set up to capture images of embezzlement, but did
28 serendipitously happen to pick up the criminal activity of the three Smarte Carte employees in January

1  2009. After Smarte Carte learned of how its three Assistant Terminal Managers were stealing, the
2  system was changed so that only certain senior employees (above plaintiff's level) had direct access to
3  the cashbox. (Declaration of Larry Needham, ¶3.)
4      On Monday evening, February 2, 2009, a skycap named Romeo Fernando apparently observed
5  plaintiff repeatedly taking cash from prospective Smarte Carte patrons at Unit #30, located on the upper
6  (departure) level at the International Terminal, putting the money into his pocket and releasing the carts
7  to those customers. He told this to Linard Davis, employed at the Airport Travel Agency, who observed
8  plaintiff doing the same thing. Mr. Davis called Alla Serdyuchenko, who was Smarte Carte's onsite
9  manager at SFO. Ms. Serdyuchenko, in turn, emailed her superiors, and early on the morning of
10 February 3rd was advised by email that she should ask "Frank" of the police department to investigate to
11 see whether there was validity to the report. (Declaration of Frank Kastell, ¶3; Declaration of Larry
12 Needham, ¶8.)
13     Detective Kastell received a telephone call from Ms. Serdyuchenko on the morning of February
14 3rd, and she also faxed over some identifying information regarding Mr. Arden (passport photo and
15 driver's license photo) as apparently Mr. Arden was the only person who fit the physical and clothing
16 description supplied to her by Mr. Davis. Ms. Serdyuchenko also generally described Arden's job duties
17 as an Assistant Terminal Manager for that afternoon and early evening. Detective Kastell started his
18 investigation by speaking with Mr. Davis later than morning, or early in the afternoon, and Mr. Davis
19 generally re-stated the information he provided to Ms. Serdyuchenko the evening before. Declaration of
20 Frank Kastell, ¶¶ 3,4.)
21     At approximately 4:30 p.m. on February 3rd, Detective Kastell and his partner, Detective John
22 Corkery "staked out" Unit 30 at the International Terminal. Both detectives were in plainclothes, and had
23 not had previous contact with Arden. For most of the ensuing 2+ hours, the detectives were inside the
24 International Terminal, approximately 25 feet away from the front of that unit. The glass in that portion
25 of the International is what could be described as "one-way glass." Individuals standing inside the
26 terminal can look outside without a problem, but persons standing outside cannot look into the terminal,
27 but only see what could best be described as "gray glass." At one point Detective Kastell walked outside
28 for a few minutes, but apparently Arden did not notice him or suspect that Detective Kastell was a

1 Deputy Sheriff. (Declaration of Frank Kastell, ¶5; Declaration of John Corkery, ¶4.)

2 Detectives Kastell and Corkery observed plaintiff take money from customers and put it in his left front pocket a number of times from 4:30 p.m. until sometime after 6:30 p.m. At one point, Detective Kastell telephoned Ms. Serdyuchenko to explain what he was observing. She was not at the airport when they spoke, but was arriving at her home. She verified that Arden had no business taking customers' money and putting it into his pocket, and that his job duties required him to circulate throughout the airport, not remain at a single location for more than 2 hours. She verified there had been no report of problems with Unit 30, and that there would have been one or two associates whose responsibilities would cause them to take care of any issues which developed in the location, if any there were. (Declaration of Frank Kastell, ¶¶6,7; Declaration of John Corkery, ¶5.)

At one point, after the detectives observed Arden putting cash into his pocket after dispensing carts to two patrons, Detective Corkery spoke to each of the patrons after they entered the terminal. Each verified that they had given 4-$1 bills to Arden, and he, in turn, gave each of them a cart. (Declaration of John Corkery, ¶8.) The detectives also noticed that Arden had placed his jacket over the portion of Unit 30 where the special key could be inserted to release the cart locking mechanism; Arden spent 8-10 seconds either removing or inserting the key covered by the jacket, far longer than it would have taken for him to simply drape or remove the jacket from the unit, if that is all he was attempting to do. (Declaration of Frank Kastell, ¶11; Declaration of John Corkery ¶10; Declaration of Larry Needham, ¶6.)

Finally, after more than two hours, Detectives Kastell and Corkery approached Arden by Unit 30, identified themselves, and asked if would answer some questions in the Sheriff's office, located in the back portion of the International Terminal. Mr. Arden was told that he was not under arrest. Mr. Arden agreed to accompany them to the detectives' office. He was neither handcuffed, nor held or in any way touched as the three men walked to the Sheriff's office. Arden was interviewed by the detectives in an open area in a large room, seated across from Detective Kastell's desk, while Detective Corkery was seated at his own desk behind plaintiff. (Declaration of Frank Kastell, ¶12; Declaration of John Corkery, ¶11.)

Arden denied taking money from passengers. He said he would sometimes "make change" for customers with his own money, but could not explain why he would do that. (It is contrary to Smarte

Carte policy for its employees to take customers' money and put into their own pockets; making change for customers with one's own money is also prohibited. The cart dispensing units are automated, and make change themselves. Declaration of Larry Needham, ¶2.) When told that he had been observed by the detectives for two hours, and had been observed by two other people doing the same thing the day before, he stared out the window for a couple minutes, and then said "Maybe I put $4.00 in my pocket one time, but I think that was to make change." (Declaration of Frank Kastell, ¶14.)

He was asked if he would not mind removing items from his pocket. He had nothing inside his company jacket pockets, and from his left front pants pocket (the same pocket that he had been observed putting money into by both detectives) he removed $109, most of the currency being crumpled. There were 4-$10 bills, 11-$5 bills and 14-$1 bills. He told the detectives that some of the money belonged to him, but he didn't know how much. When asked where he got the money he said he had gone to the ATM on his way to work to get money for his lunch; when it was pointed out that ATMs issue $20 bills, of which he had none, and that ATMs do not issue $1, $5 and $10 bills, Arden had no response. (Declaration of Frank Kastell, ¶15.)

Detective Kastell kept and booked the money into evidence and gave Arden a receipt, and returned plaintiff 's personal property, such as his wallet, cell phone and the small change in coins; Detective Kastell retained Arden's Airport Security badge, which granted access to non-public, secure portions of SFO, and the Smarte Carte property in plaintiff's possession, including the company keys, phone, radio and parking pass. (Declaration of Frank Kastell, ¶16.) Arden was advised that the report would be submitted to the District Attorney to determine whether charges would be filed, and if so, he would be notified of when to appear in court. (Declaration of Frank Kastell, ¶16.) Detective Kastell returned the Smarte Carte property to Ms. Serdyuchenko the following morning. (Declaration of Frank Kastell, ¶16.) He completed report, which was sent to the District Attorney's office after his sergeant approved it approximately 8-10 days later. (Declaration of Frank Kastell, ¶16.) At no time during the approximately one-hour interview was Arden threatened, handcuffed, physically restrained or touched by either detective. (Declaration of Frank Kastell, ¶ 12.)

The District Attorney ultimately decided to charge plaintiff with embezzlement for his activities observed by the detectives on February 3, 2009. There were various discovery requests, to which the

1 District Attorney's office sent requests to Detective Kastell for more information or documents;
2 Detective Kastell promptly responded to each request. (Declaration of Frank Kastell, ¶17; Declaration of
3 Sharron Lee, ¶2.) At various times during the pendency of the case, the District Attorney's office
4 requested video from the SFO camera which faced the front of Unit 30 for February 2nd and 3rd, and
5 Detective Kastell contacted the San Francisco Airport Police Department to obtain those. Unknown to
6 Detective Kastell, the security camera video had a special proprietary program, and the disks he obtained
7 could not be viewed without that special program, so even though he repeatedly sent copies of the video
8 disks to the District Attorney's office, they were not viewable. (Declaration of Frank Kastell, ¶17;
9 Declaration of Sharron Lee, ¶2.) Eventually the District Attorney was able to obtain a disk directly from
10 the San Francisco Police Department which had the special program, and produced it to the defense. Any
11 delay in obtaining the video with the proprietary program was not due to any wrongdoing on Detective
12 Kastell's part. (Declaration of Sharron, Lee, ¶2.

13 The video is significant in that it shows Arden standing around Unit 30 for more than two hours
14 on both February 2nd and 3rd, taking money from customers approximately a dozen times, and putting it
15 into his pocket on February 3rd, violations of Smarte Carte policy and his job description. (Declaration of
16 Larry Needham, ¶¶5,9.) Despite plaintiff's allegations that the video was exculpatory (Plaintiff's 2nd
17 Amended Complaint, ¶28, Docket #62), the video in fact corroborated the observations of Detectives
18 Kastell and Corkery. (Declaration of Frank Kastell, ¶18.)

19 Eventually, the District Attorney dismissed the charges. (Plaintiff's 2nd Amended Complaint,
20 ¶29, Docket#62.) The $109 currency was returned to plaintiff in due course after his counsel obtained
21 the required court order for release of evidence. (Plaintiff's 2nd Amended Complaint, ¶30, Docket #62.)

22 **II.    STATEMENT OF THE CASE**

23 Plaintiff's initial Complaint (Docket #1) and 1st Amended Complaint (Docket #3) were filed in
24 2010, against a variety of defendants, including Smarte Carte and a number of its employees, Airport
25 Travel Agency and its principal, Linard Davis, and Detective Kastell. There were a variety of claims for
26 relief, including a Federal Civil Rights Act claim and numerous state claims. Subsequently plaintiff
27 dismissed the Smarte Carte defendants, settled with Davis and Airport Travel Agency, and filed his 2nd
28 Amended Complaint on May 13, 2011, alleging a single Federal Civil Rights Act claim against Detective

Frank Kastell, essentially alleging that Detective Kastell lacked probable cause to detain plaintiff, and to confiscate the currency stuffed in plaintiff's pocket, and also alleges that Detective Kastell intentionally and maliciously delayed producing video that could be viewed by plaintiff's criminal defense counsel (same attorney representing him in this matter) and destroyed evidence. Detective Kastell's answer denies these allegations and asserts various affirmative defenses, including qualified immunity. (Answer to 2nd Amended Complaint, Docket #63.)

Discovery, including expert discovery, was completed in June 2011. Trial is scheduled to commence on January 9, 2012.

### III. DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted

> "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial … since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of identifying portions of the record which show that the nonmoving party has disclosed no "significant probative evidence tending to support the complaint." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968).

Once the moving party has made its showing, the burden then shifts to the nonmoving party to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted); *see also T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (finding that nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the Court does not make credibility determinations (*Id.* at 249), and views inferences drawn from the facts in the light most favorable to the party opposing the motion, (*T.W. Elec.*, 809 F.2d at 631), a plaintiff can avoid summary judgment only by making "a sufficient showing on an essential element of

her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.[1] The defendant is not required to "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. at 323.

### A. Detective Kastell is Entitled to Summary Judgment, as he did not Arrest Plaintiff, and he had Good Cause to Detain and Question Plaintiff, and to Confiscate the Proceeds of Plaintiff's Crime and to take the Airport Security Badge and Employer's Equipment which, if it Remained in Plaintiff's Possession, Could Jeopardize Security at the Airport.

It is plaintiff's position that he was "unlawfully detained and/or arrested … without probable cause." (2nd Amended Complaint, ¶32, Docket #62.) However, he was never placed under arrest or booked, voluntarily accompanied the detectives, was never handcuffed, grabbed or touched by either detective, answered most of the questions posed to him, and was free to leave after he answered questions. However, the detectives had probable cause to detain and question (and even arrest him) based on their observations and knowledge of the relevant Smarte Carte procedures.

Probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that" a crime had been committed. *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). "A police officer has probable cause to effect an arrest if 'at the moment the arrest was made ... the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect had violated a criminal law." *Orin v. Barclay*, 272 F.3d 1207, 1218 (9th Cir. 2001).

Here Detective Kastell had observed plaintiff standing at Unit 30 for more than two hours, taking cash from approximately 12 customers, and putting it into his pocket (in derogation of what he

---

[1] To create a factual issue on summary judgment, evidence must be "specific" and "substantial". *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (Title VII context). Evidence which amounts to only speculation is insufficient to withstand a motion for summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the party opposing the motion "must do more than show that there is some metaphysical doubt as to the material facts"); *Nat'l Indus., Inc. v. Republic Nat'l Life Ins. Co.*, 677 F.2d 1258, 1267 (9th Cir. 1982) (on a motion for summary judgment "[i]n drawing inferences, the trier of fact is not permitted to resort to speculation and surmise").

1   understood from Ms. Serdyuchenko to be the Smarte Carte policies – and which have been further
2   verified by the Declaration of her supervisor, Larry Needham, ¶¶5,9.)  His partner, Detective Corkery,
3   spoke to two of the customers who confirmed that each had handed 4-$1bills to plaintiff, and both
4   detectives watched him put those bills into his left front pants pocket.  And significantly, plaintiff gave
5   evasive answers to questions regarding his taking cash from customers, as well as the response about
6   having the cash because he went to an ATM machine on his way to work, yet having only small bills,
7   and no $20 bills, of which is common knowledge that $20 bills are the denomination dispensed by
8   ATMs.  The detectives observed a crime committed in their presence by plaintiff, and had more than
9   enough "reasonably trustworthy information were sufficient to warrant a prudent man in believing' that
10  the suspect had violated a criminal law" sufficient to justify an arrest.  *Orin v. Barclay*, 272 F.3d 1207,
11  1218 (9th Cir. 2001).  *A fortiori*, there was more than ample evidence to justify the detention, questioning
12  and confiscation of the crime proceeds from plaintiff.

13      Plaintiff complains that the Airport Security badge should not have been taken from him by the
14  detectives (2nd Amended Complaint, ¶34, Docket #62.)  However, he implicitly acknowledges that it was
15  not his personal property, but rather had been issued by SFO (2nd Amended Complaint, ¶17, Docket #62),
16  and never does allege (nor could he) that the Airport Security badge belonged to him.  Confiscating the
17  airport security badge could therefore not be a deprivation of plaintiff's property. Since the detectives
18  had observed his larcenous conduct, and knowing that with the Airport Security badge, he could walk
19  into potentially sensitive areas of the airport not accessible to the general public, Detective Kastell was
20  justified in seizing plaintiff's Airport Security badge and giving it to his employer to deal with as Smarte
21  Carte deemed appropriate.  It is well settled that even involuntary warrantless searches (unlike the instant
22  case, in which plaintiff voluntarily emptied his pockets and placed the items on Detective Kasell's desk)
23  are authorized under "special needs, " such as border checkpoints (*United States v. Martinez-Fuerte*, 428
24  U.S. 543 (1976)), drug and alcohol testing of railroad employees involved in accidents (*Nat'l Treasury*
25  *Employees Union v. Von Raab*, 489 U.S. 656 (1989), and at airports (*Chandler v. Miller*, 520 U.S. 305
26  (1979).)  Under the specific facts of this case, it was well within justifiable cause for Detective Kastell to
27  take plaintiff's Airport Security badge overnight and give it to Smarte Carte the next morning.
28  Permitting plaintiff  to keep his Smarte Carte keys and equipment would also permit him to continue his

theft of Smarte Carte monies at the numerous cart dispensing units located throughout SFO, unless the Sheriff's office would assign someone to follow him for the rest of the evening.

### B. Even Assuming that Plaintiff was Arrested or Detained Without Probable Cause, Detective Kastell is Protected by Qualified Immunity Because his Actions were Neither Contrary to Clearly Established Law Nor Unreasonable.

> The defense of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The rule of qualified immunity provides ample support to *all but the plainly incompetent* or those who knowingly violate the law. Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful… . The qualified immunity test requires a two-part analysis: (1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful? *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1993) (citations omitted) (emphasis added).

"Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation omitted); *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) (applying California's statutory version of qualified immunity) (citing Cal. Penal Code § 847(b)(1)). Because Detective Kastell's conduct was not both a violation of clearly established law and objectively unreasonable, he is entitled to qualified immunity.

If one were to look at the facts available to Detective Kastell in a vacuum, one could theoretically argue that if a plain ordinary citizen who stood somewhere for 2 hours, took $4 from someone, placed it into his pocket, and handed her a luggage cart, then he did not necessarily observe a crime being committed. But this is not a vacuum; Detective Kastell had information which revealed that plaintiff was *not* supposed to stand around by Unit 30 for more than 2 hours at a time while working, as he had done on February 3rd as well as the day before, and he was *not* supposed to be taking patrons' cash and putting it into his pocket, and that the information had been verified by plaintiff's supervisor, Ms. Serdyuchenko, corroborated what he was told by witnesses Romeo Fernando and Linard Davis, and which had been also witnesses by Detective Kastell. Embezzling money from one's employer is a violation of California Penal Code §503. Defendant is unaware of any authority that stealing from one's employer is not a crime in California or that he was violating clearly established law by enforcing Penal Code §503.

Moreover, for the same reasons, Detective Kastell's actions were inherently reasonable. He and his partner had observed this conduct for more than 2 hours, had gotten confirmation from Ms. Serdyuchenko that his actions were flatly contrary to company policy and procedure, and then plaintiff had evasive answers to simple questions regarding taking customers' money and putting it into his pants pocket, and how, if he went to an ATM, he had numerous small, crumpled bills, but no nice clean $20 bills in his possession. Accordingly, he is immune from suit for detaining and questioning Arden, and confiscating the fruits of his illegal enterprise, and preventing Arden from breaching airport security.

Insofar as the allegations that Detective Kastell somehow should have known that SFO security camera video required an unusual computer program, and that he purposely sent disks that he knew to be flawed are contrary to the facts. Detective Kastell did not have that knowledge, and the issue of the special program for the video regarding the other 3 individuals (who had previously embezzled money from Smarte Carte) was not known to him at the time of plaintiff's detention on February 3. Indeed the charges against the other 3 men were not filed until a week or more later, much less discovery issues coming to bear on those matters. (Declaration of Frank Kastell, ¶17.) Further, the District Attorney's office apparently did not know about the special program for this video until late in the prosecution, and Deputy District Attorney Sharron Lee is aware of no misconduct or unreasonable delay or any other wrongdoing on Detective Kastell's part in reference to providing video to her as requested. (Declaration of Sharron Lee, ¶2.) Even if there was an obligation for Detective Kastell to have personally attempted to sort out why disks which were provided to him by the San Francisco Police Department were not viewable by plaintiff's attorney, there is no known constitutional right requiring him to do so. In short, since there is no clearly established law requiring Detective Kastell to have pursued why the disks were not viewable without the special program, he is entitled to qualified immunity for not anticipating that legal development.

### IV.     CONCLUSION

The evidence presented to Detectives Kastell and Corkery on February 3, 2009 was overwhelming as to Arden's culpability. He was spending hours in an area which he was tasked to spend a minute or two. He was taking customers' money and putting into his pocket. He was standing in front of a cart dispensing unit making funny motions as if he were inserting bills, but he was not doing so. He

put his jacket over the back of the unit where the special key for disabling the locking mechanism would be inserted. He removed a cart from the unit without putting any money into it, and then proceeded to attempt to rent it to several different customers, and when he received money, put it into his pocket rather than the Unit. He ran from one unit to the other to grab a cart, so that he could bring it back to the first unit to give to a customer.

When questioned, he gave some evasive answers, and his explanation for all the small unmarked bills in his pocket (that he had gone to the ATM), was nonsensical; he then declined to further explain how he could have all those crumpled $1, $5 and $10bills in his pocket, while having no $20 bills. And even then he admitted that "some of the money was his own."

That the video further incriminates him is simply additional evidence of the validity of the detectives' observations. That the video had "technical problems", neither caused by nor known to Detective Kastell had nothing to do with Arden taking money that did not belong to him.

Essentially, plaintiff is seeking to impose strict liability on Detective Kastell because the District Attorney declined to prosecute. That is why the doctrine of qualified immunity comes into play: to protect a police officer such as Detective Kastell. While plaintiff may disagree about the interpretation of the conclusions of Detectives Kastell and Corkery, and of Larry Needham of Smarte Carte, at the minimum, Detective Kastell is entitled to the benefit of qualified immunity. There are no undisputed *material* facts, and Detective Kastell's motion for summary judgment should be granted.

Dated: October 17, 2011  Respectfully submitted,

JOHN C. BEIERS, COUNTY COUNSEL


By: _____/s/_____.
    David A. Levy, Deputy
    Attorneys for Defendant
    FRANK KASTELL