JOHN C. BEIERS, COUNTY COUNSEL (SBN 144282)
By: David A. Levy, Deputy (SBN 77181)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA 94063
Telephone: (650) 363-4756
Facsimile: (650) 363-4034
E-mail: dlevy@co.sanmateo.ca.us

Attorneys for Defendant
FRANK KASTELL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY ARDEN,<br><br>    Plaintiff,<br><br>vs.<br><br>FRANK KASTELL, et al.,<br><br>    Defendants. | Case No. C 10-0436 NC<br><br>**DECLARATION OF FRANK KASTELL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:         November 30, 2011<br>Time:        9:00 a.m.<br>Courtroom: A, 15th Floor |

Frank Kastell, declares:

1. I am employed by the San Mateo County Sheriff's Office as a Deputy Sheriff, and have been since 1970. Over the years I have worked in various positions within the Sheriff's Office. I have been a detective since approximately 1990, and have been posted at San Francisco International Airport (SFO) since approximately 1990. I investigate many incidents throughout the airport, parking lots and garages, including possible crimes, as well as incidents that may not involve criminal activity (such as accidents.) I have received numerous commendations for my work in the Sheriff's Office, both prior to and during my work at SFO.

2. Approximately a month before the incident involving Mr. Arden, I was asked to participate in an investigation of three Smarte Carte employees who were suspected of embezzling money from their employer, by using a key to directly access the cashbox from one of the Smarte Carte cart-dispensing units at the airport; I was one of several detectives assigned to the investigation, and did some

Case No. C 10-0436 NC
DECLARATION OF FRANK KASTELL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

surveillance of one of the suspects. All three suspects were eventually arrested, charged, and their cases were resolved without trial. I understood that Smarte Carte took measures after the arrests to limit the number of employees who had direct access to the cash boxes, and changed the locks.

3. On the morning of February 3, 2009, I received a call from Ms. Alla Serdyuchenko, who was Smarte Carte's onsite manager at SFO; I had some contact with her during the investigation of the other three individuals. Ms. Serdyuchenko told me that she had received a telephone call from Linard Davis, who operated a company at SFO (Airport Travel Agency), and that he reported that he had observed what he believed to be an ongoing theft of money by a Smarte Carte employee, and that he had first been advised of this by an SFO skycap, who was also a non-Smarte Carte employee. I was told that she had been given a physical description, and that the suspect was a Smarte Carte manager. She identified him by name (Gary Arden), stated that based on the description, he was the only manager on duty in the evening, and that he would be working that evening (Tuesday, February 3.) Ms. Serdyuchenko further advised me that Mr. Arden was not supposed to be posted at a single location, as he was responsible for all the Smarte Carte employees throughout the terminal, and that he had been observed by Smarte Carte Unit 30, located on the upper (departure) level of the International Terminal, near the curb. This was the unit I had observed the prior suspect removing money from the cash box. Mr. Davis told her that he observed the employee take money from patrons, put it into his left front pants pocket, and give the patron a cart. Ms. Serdyuchenko faxed me some identifying information from Mr. Arden's personnel file, which included his California Driver's License and passport photos.

4. I interviewed Mr. Davis later that day, and he confirmed the physical description of Mr. Arden, and described his work outfit, which included a dark gray shirt with a Smarte Carte logo. He did not know Mr. Arden . Mr. Davis told me he observed the prior evening he observed the man taking money from 4-5 customers, place the money in his pocket, and give a Smarte Carte to each customer, all near the curb on the upper level of the International Terminal.

5. At approximately 4:30 on the afternoon of February 3rd, my partner, Detective John Corkery and I went to the International Terminal, near Smarte Carte Unit 30. We remained in the area approximately two hours. Initially we were inside the terminal, and could clearly see outside to the area around Unit 30. The International Terminal has what I would describe as "one-way glass." People

Case No. C 10-0436 NC     2
DECLARATION OF FRANK KASTELL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

inside the terminal can look outside, but individuals standing outside, attempting to look into the terminal can only see what looks like gray glass, and cannot see inside the terminal. Detective Corkery and I were in plainclothes, so anyone who observed us standing around might have assumed we were a couple of passengers waiting for our flight, as opposed to being detectives. From where Detective Corkery and I were standing, we were generally perpendicular to Unit 30. During the next two hours, we would occasionally move a few feet in one direction or the other in order to get a better view (in case someone happened to stand outside in our line of sight.) I also walked outside briefly at least once during the observation period. Other than momentary visual obstructions (perhaps a couple seconds) either Detective Corkery or I, or both of us, had Mr. Arden under observation for a little more than two hours.

6. When Detective Corkery and I arrived at the terminal, we saw the man described by physical description and clothing (and photo identification) as Mr. Arden. He had his jacket draped over the back of the front portion of Unit 30. We observed him numerous times take cash from potential patrons, give them a cart, and place the cash in his left front pants pocket.

7. After a while I telephoned Ms. Serdyuchenko on her cell phone. I gave a physical description of the man, and she verified that it was Gary Arden. I described to her what we were observing Mr. Arden doing (as described in ¶6 above.) She verified that his responsibility was to move throughout the airport to supervise other employees and make sure they were doing their jobs, and that in particular, he was to make sure that the other employees move carts from one Unit to another, because it needed repair. The Unit needing to be repaired was *not* Unit 30 and was at a different location. She also confirmed that it was against company policy for Mr. Arden to work a unit in this fashion, and advised me that if he was putting money in his pocket, he is stealing from the company. She also told me that if he was putting money into the slot at the front of the machine, he must have disengaged the locking mechanism to release the carts. She explained to me about the special key which would be inserted just behind the front of the Unit, which would release the carts, and as she described it, it was located where the draped jacket would cover it up.

8. As Detective Corkery and I continued to observe Mr. Arden, I saw the skycap, Romeo Fernando, who according to Mr. Davis had tipped him off regarding these activities the prior day (February 2nd.) I went over to speak to Mr. Fernando, while Detective Corkery remained to observe Mr.

Case No. C 10-0436 NC                                3
DECLARATION OF FRANK KASTELL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Arden. Mr. Fernando told me that he had observed essentially what Mr. Davis had told me earlier in the day, that is, that he saw Mr. Arden take cash from customers at least 5 times, and put the money in his pocket. Mr. Fernando told me he was quite upset, because this man (Mr. Arden) was worse than the prior three employees who had been caught "put together."

9. After speaking to Mr. Fernando, I returned to observe Mr. Arden with Detective Corkery. Mr. Arden continued to operate in the same fashion, that is, he would take money from customers, and put it into his pocket without inserting the money into the Unit. At some point, Detective Corkery spoke to two different customers, after they had walked into the terminal, He inquired whether they had given money to Mr. Arden, and they each told him they had given him 4-$1 bills, and gave them a cart. Both Detective Corkery and I had observed Mr. Arden put the money he received from those customers into his pants pocket.

10. There were several occasions when Mr. Arden, after taking money from customers, would walk up to the front of Unit 30, and make some rapid hand gestures, so that someone standing behind him might think he was depositing cash into the unit. However, since Detective Corkery and I were standing to his right side (and he was unaware of our presence) we could observe that he was not actually inserting cash into the slot.

11. At one point, Mr. Arden removed his jacket draped over the back of the Unit; the act of grabbing his jacket should have taken a second, but he kept his hand behind the Unit for nearly 8 seconds, which would be consistent with him taking our or inserting the special key. Unfortunately he stood directly in front of us, and by the time we could get a view of what he was doing he had removed the jacket and walked away. He later returned to that portion of the unit and leaned back in the area where one would insert that special key for approximately 10 seconds, then went to the font of the Unit and removed a cart, without putting any money into the Unit. He took the cart to several potential customers who were unloading bags and boxes from their vehicles, and appeared to be attempting to peddle the cart. After the first group of customers declined, he took the cart to another group, and a customer handed him some money in exchange for the cart. Mr. Arden did not place the money he received into the unit.

12. At approximately 7:00 p.m. Detective Corkery and I concurred that we had seen sufficient

questionable conduct to detain and question Mr. Arden regarding his activities. We approached him, identified ourselves, and asked if he would be willing to accompany us to our office to answer some questions. We told Mr. Arden that he was not under arrest. He had no objection to accompanying Detective Corkery and me, and the three of us walked to our office, located in the International Terminal. He was not handcuffed, nor did either Detective Corkery or I touch him. If anyone had watched us, they would have assumed it was just three guys walking towards the back of the terminal. Our office is in a secure part of SFO (it is not accessible to the general public) but one does not need a key to leave the office and return to the public area of the terminal. I sat at my desk, and Mr. Arden sat in the aisle, facing my desk, while Detective Corkery sat at his own desk, approximately five feet behind Mr. Arden. Our desks are located in a very large open room, with many desks and cubicles. I asked Mr. Arden a number of questions, and he did not object to any of them. At no time was Mr. Arden handcuffed or otherwise restrained by Detective Corkery, and he was never threatened with any physical harm. We spoke for approximately an hour, and at no time did Mr. Arden ask to terminate the interview, to leave, to request an attorney, or give any other indication that he was not willing to answer any question.

      13. I questioned him as to his duties, and he claimed not to have been told by Smarte Carte management what his duties were. He said his job was to assist customers and make change (this was contrary to what I had been advised by Ms. Serdyuchenko, his supervisor.) He agreed that Unit 30 was in good repair, and did not remember the last time it had been repaired, even though it was the busiest at the airport.

      14. I expressly asked Mr. Arden if he had ever taken money from a passenger, given him or her a Smarte Carte, and put the money in his pocket, and he denied it, saying, "No, why would I do that?" He said he only took customers' money to make change, and sometimes he would use his own money; when asked why he would do that, he did not answer, just shrugged his shoulders. I asked him about taking customers' cart rental fees and putting them into his own pocket in several different ways, and each time he denied doing so, stating he always put the monies into the Unit. When I told him that Detective Corkery and I had observed him for two hours collecting money from customers and putting the money into his pocket, and giving the carts to the customers without depositing the cash into the Smarte Carte Unit, he said "I have never done that." When I mentioned that the day before 2 witnesses reported

observing him do just that, he sat still for a couple minutes, looking out the window, and then said, "Maybe I put $4.00 in my pocket one time, but I think that was to make change."

15. I then asked if he would not mind removing all items from his pockets, and he had no objection. His company jacket pockets were empty. He removed a company cell phone, company keys and a few coins from his right front pants pocket; he removed $109 from his left front pants pocket, most of it crumpled currency, as if it had been stuffed into his pocket, as opposed to being folded in an orderly fashion. There were 4-$10 bills, 11-$5bills and 14-$1 bills. He said some of the money belonged to him, but he did not know how much. He said he stopped at the ATM on his way to work to get money for his lunch, and denied buying anything after stopping at the ATM. He did not remember how much he had withdrawn from the ATM. When I pointed out to him that ATMs issue $20 bills, of which he had none, and ATMs do not provide $1, $5 and $10 bills, he would not respond to that statement.

16. Given that both Detective Corkery and I witnesses him taking customers' money (belonging to Smarte Carte), that he had given several evasive answers, that the two customers with whom Detective Corkery confirmed what we observed, and that we had been informed by his supervisor, Ms. Serdyuchenko that he was not supposed to take customers' money and put it into his pocket, and he was not supposed to stay by a single Unit for more than a minute or so, much less two hours, I determined that I had enough evidence to confiscate what appeared to be important evidence of the potential commission of the crime of embezzlement (Penal Code §503.) Accordingly, I took the $109 in currency, counted it out in front of Mr. Arden and Detective Corkery, booked the money into evidence and gave Mr. Arden a receipt. Also, since Mr. Arden had committed this crime in the presence of Detective Corkery and me, I also took his airport security badge, which gave him access to secure areas of the airport not accessible by the general public, as well as the Smarte Carte phone, radio, parking pass and keys. I returned his wallet and the few coins, as they were not evidence, nor jeopardized Airport security. He did not have personal keys; I believe he had a cell phone, but I did not keep that, and returned it to him. I did not arrest Mr. Arden, although I believe I had sufficient cause to do so. I advised hi m that I would forward my report to the District Attorney, who would decide whether to file charges, and he would be notified of a court date if and when it was set. I put all the Smarte Carte equipment and airport security badge aside, and gave them to Ms. Serdyuchenko when she returned to

1  work the next morning. I prepared a report and forwarded it to the District Attorney's office after
2  approval by my sergeant approximately 8-10 days later.

3      17. The District Attorney decided to charge Mr. Arden with embezzlement, and at various times
4  over the next several months I received "goldenrods" from the Deputy District Attorneys who were
5  variously assigned to the case. "Goldenrod" refers to a term used by the San Mateo County District
6  Attorney's office to request the investigating officer for additional information, documentation, witness
7  statements, or other information which the District Attorney needs; the request for additional information
8  is printed on gold-colored paper. I attempted to promptly provide the District Attorney's office with the
9  information or documents sought as quickly as I could. I was asked to obtain a copy of video which the
10 San Francisco Police Department can extract from SFO video cameras (the Sheriff's office does not have
11 direct access to the video, but the San Francisco Police Department is usually quite responsive, either to
12 our office or the District Attorney.) When I was contacted, I obtained disks from the S.F. Police
13 Department and forwarded them on to the District Attorney. I had no knowledge that there was a special
14 software program installed by SFO Security, as videos did not become an issue in the prior case until
15 sometime during the spring of 2009 (the criminal complaint against the 3 employees was not even filed
16 until a week or more after Mr. Arden's detention.) I am not particularly knowledgeable regarding
17 nuances of software programs, and I assumed that since I could view the video disks on my computer,
18 that they worked on everyone's computers. Eventually I learned that there is a special program required
19 to view the disks, and the San Francisco Police Department made arrangements for the District Attorney
20 and defense counsel to obtain that program. There was absolutely no intention on my part to delay
21 producing the disks to the District Attorney's office. At no time did I request that any video be
22 destroyed, or in any way tamper with evidence or potential evidence.

23     18. I have reviewed the video of February 3, 2009, during the period when Detective Corkery
24 and I were observing Mr. Arden (approximately 4:30 p.m. to 7:00 p.m.) The video camera is fixed, and
25 shows the area near Unit 30 "head on." Therefore, when Mr. Arden was standing in front of the Unit, the
26 camera captured his back and his elbows, but rarely showed his hands, and his body blocked the view of
27 the camera of the slot to insert currency into the Unit. However, from the side, Detective Corkery and I
28 had a much better view of what Mr. Arden was doing in relation to taking money from customers and

putting it into his pocket, rather than inserting the bills into the Unit. However, the video does show enough behavior calling into question what he was doing in the area of Unit 30, especially given that we were advised that his job duties required him to be moving throughout all three SFO terminals, on both arrival and departure levels, both inside and outside the terminals, as well as the various levels of the parking garages.

18. I appeared at numerous hearing on this case during the approximately 6 months that the case was pending. As I understood it, there were numerous reasons for continuances, including defense counsel being located out of state, as well as additional discovery requests. None of these continuances were in any way related to my conduct in investigation of the case, intentional or bad faith conduct in responding to discovery, or anything else that was within my knowledge and control.

19. At all times I followed appropriate police procedures in dealing with this matter. I harbored no ill will towards Mr. Arden, and was simply doing as conscientious a job as I could. The allegations in the complaint that I intended to deprive Mr. Arden of his civil rights, and kept exculpatory evidence from him and his attorneys, or that I did anything maliciously or falsely are completely inaccurate.

I declare under penalty of perjury that the foregoing is true and correct and executed on October 15, 2011 in San Bruno, California.

_____
Detective Frank Kastell, Deputy Sheriff

Case No. C 10-0436 NC                              8
DECLARATION OF FRANK KASTELL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT