1 | JOHN C. BEIERS, COUNTY COUNSEL (SBN 144282)
By: David A. Levy, Deputy (SBN 77181)
2 | Hall of Justice and Records
400 County Center, 6th Floor
3 | Redwood City, CA 94063
Telephone: (650) 363-4756
4 | Facsimile: (650) 363-4034
E-mail: dlevy@co.sanmateo.ca.us

5

Attorneys for Defendant
6 | FRANK KASTELL

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10

11 | GARY ARDEN,

Case No. C 10-0436 NC

12 | Plaintiff,

**DECLARATION OF JOHN CORKERY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

13 | vs.

14 | FRANK KASTELL, et al.,

Date: **November 30,2011**
Time: **9:00 a.m.**
15 | Defendants.

Courtroom: **A, 15th Floor**

16

John Corkery declares:

17

1. I am employed by the San Mateo County Sheriff's Office as a Deputy Sheriff and have been

18

so employed since 2000. I worked as a Correctional Officer in the San Mateo County Jail from 1997-

19

2000. I have worked in various positions within the Sheriff's Office, including patrol and investigations.

20

I have been a detective since 2005, and have been posted at San Francisco International Airport (SFO)

21

for nearly 4 years. I investigate many incidents throughout the airport, parking lots and garages,

22

including possible crimes, as well as incidents that may not involve criminal activity (such as accidents.)

23

2. Approximately a month before the incident involving Mr. Arden, I was asked to participate in

24

an investigation of three Smarte Carte employees who were suspected of embezzling money from their

25

employer, by using a key to directly access the cashbox from one of the Smarte Carte cart-dispensing

26

units at the airport; I was one of several detectives assigned to the investigation, and did some

27

surveillance of one of the suspects. All three suspects were eventually arrested, charged, and their cases

28

Case No. C 10-0436 NC
DECLARATION OF JOHN CORKERY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1    were resolved without trial. I understood that Smarte Carte took measures after the arrests to limit the

2    number of employees who had direct access to the cash boxes, and changed the locks.

3        3. On February 3, 2009, I was advised that my partner, Detective Frank Kastell received a call

4    from Ms. Alla Serdyuchenko, who was Smarte Carte's onsite manager at SFO; I had some contact with

5    her during the investigation of the other three individuals. Detective Kastell explained to me that Ms.

6    Serdyuchenko conveyed information that one of her employees might be stealing money from the

7    company. Detective Kastell told me that he had interviewed a Mr. Davis, who worked for Airport Travel

8    Agency, who explained to him what he observed the day before.

9        4. At approximately 4:30 on the afternoon of February 3rd, Detective Kastell and I went to the

10   International Terminal, near Smarte Carte Unit 30. We remained in the area approximately two hours.

11   Initially we were inside the terminal, and could clearly see outside to the area around Unit 30. The

12   International Terminal has what I would describe as "one-way glass." People inside the terminal can

13   look outside, but individuals standing outside, attempting to look into the terminal can only see what

14   looks like gray glass, and cannot see inside the terminal. Detective Kastell and I were in plainclothes, so

15   anyone who observed us standing around might have assumed we were a couple of passengers waiting

16   for our flight, as opposed to being detectives. From where Detective Kastell and I were standing, we

17   were generally perpendicular to Unit 30. During the next two hours, we would occasionally move a few

18   feet in one direction or the other in order to get a better view (in case someone happened to stand outside

19   in our line of sight.) I also walked outside briefly at least once during the observation period. Other

20   than momentary visual obstructions (perhaps a couple seconds) either Detective Kastell or I, or both of

21   us, had Mr. Arden under observation for a little more than two hours.

22       5. When Detective Kastell and I arrived at the terminal, we saw the man described by physical

23   description and clothing (and photo identification) as Mr. Arden. He had his jacket draped over the back

24   of the front portion of Unit 30. We observed him numerous times take cash from potential patrons, give

25   them a cart, and place the cash in his left front pants pocket.

26       6. After a while Detective Kastell had a telephone conversation with Ms. Serdyuchenko.

27   Obviously I only heard one side of the conversation. Detective Kastell told me that he gave her a

28   physical description of the man we were watching, and she verified that it was Gary Arden. He

Case No. C 10-0436 NC                                    2
DECLARATION OF JOHN CORKERY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1 described to her what we were observing Mr. Arden doing (as described in ¶5 above.) He told me that
2 she told him that Arden's responsibility was to move throughout the airport to supervise other employees
3 and make sure they were doing their jobs. Detective Kastell told me that she explained that it was
4 against company policy for Mr. Arden to work a unit in this fashion, and advised that if he was putting
5 money in his pocket, he is stealing from the company. Detective Kastell relayed that if Mr. Arden was
6 putting money into the slot at the front of the machine, he must have disengaged the locking mechanism
7 to release the carts. There is apparently a special key which would be inserted just behind the front of the
8 Unit, which would release the carts, and as she described it to Detective Kastell, it was located where the
9 draped jacket would cover it up.

10   7. As we continued to observe Mr. Arden, Detective Kastell notice that the skycap, Romeo
11 Fernando, who according to Mr. Davis had tipped him off regarding these activities the prior day
12 (February 2nd.) Detective Kastell went over to speak to Mr. Fernando, while I continued to observe Mr.
13 Arden.

14   8. After Detective Kastell returned after speaking to Mr. Fernando,. Mr. Arden continued to
15 operate in the same fashion, that is, he would take money from customers, and put it into his pocket
16 without inserting the money into the Unit. At some point, I spoke to two different customers, after they
17 had walked into the terminal, I inquired whether they had given money to Mr. Arden, and they each told
18 him they had given him 4-$1 bills, and he gave them a cart. Both Detective Kastell and I had observed
19 Mr. Arden put the money he received from those customers into his pants pocket.

20   9. There were several occasions when Mr. Arden, after taking money from customers, would
21 walk up to the front of Unit 30, and make some rapid hand gestures, so that someone standing behind
22 him might think he was depositing cash into the unit. However, since Detective Kastell and I were
23 standing to his right side (and he was unaware of our presence) we could observe that he was not actually
24 inserting cash into the slot.

25   10. At one point, Mr. Arden removed his jacket draped over the back of the Unit; the act of
26 grabbing his jacket should have taken a second, but he kept his hand behind the Unit for nearly 8
27 seconds, which would be consistent with him taking our or inserting the special key. Unfortunately he
28 stood directly in front of us, and by the time we could get a view of what he was doing he had removed

1  the jacket and walked away. He later returned to that portion of the unit and leaned back in the area

2  where one would insert that special key for approximately 10 seconds, then went to the font of the Unit

3  and removed a cart, without putting any money into the Unit. He took the cart to several potential

4  customers who were unloading bags and boxes from their vehicles, and appeared to be attempting to

5  peddle the cart. After the first group of customers declined, he took the cart to another group, and a

6  customer handed him some money in exchange for the cart. Mr. Arden did not place the money he

7  received into the Unit.

8      11. At approximately 7:00 p.m. Detective Kastell and I concurred that we had seen sufficient

9  questionable conduct to detain and question Mr. Arden regarding his activities. We approached him,

10  identified ourselves, and asked if he would be willing to accompany us to our office to answer some

11  questions. We told Mr. Arden that he was not under arrest. He had no objection to accompanying

12  Detective Kastell and me, and the three of us walked to our office, located in the International Terminal.

13  He was not handcuffed, nor did either Detective Kastell or I touch him. If anyone had watched us, they

14  would have assumed it was just three guys walking towards the back of the terminal. Our office is in a

15  secure part of SFO (it is not accessible to the general public) but one does not need a key to leave the

16  office and return to the public area of the terminal. I sat at my desk, and Mr. Arden sat in the aisle,

17  facing Detective Kastell's desk. I was located approximately five feet behind Mr. Arden. Our desks are

18  located in a very large open room, with many desks and cubicles. Detective Kastell asked Mr. Arden

19  most of the questions, although I may asked a few questions; Mr. Arden did not object to any of the

20  questions. At no time was Mr. Arden handcuffed or otherwise restrained by Detective Kastell or me, and

21  he was never threatened with any physical harm. We spoke for approximately an hour, and at no time

22  did Mr. Arden ask to terminate the interview, to leave, to request an attorney, or give any other indication

23  that he was not willing to answer any question.

24      12. Mr. Arden was questioned as to his duties, and he claimed not to have been told by Smarte

25  Carte management what his duties were. He said his job was to assist customers and make change (this

26  was contrary to what Detective Kastell told me he had been advised by Ms. Serdyuchenko, his

27  supervisor.) Mr. Arden agreed that Unit 30 was in good repair, and did not remember the last time it had

28  been repaired, even though it was the busiest at the airport.

1      13. Detective Kastell expressly asked Mr. Arden if he had ever taken money from a passenger,
2   given him or her a Smarte Carte, and put the money in his pocket, and he denied it, saying, "No, why
3   would I do that?" He said he only took customers' money to make change, and sometimes he would use
4   his own money; when asked why he would do that, he did not answer, just shrugged his shoulders. Mr.
5   Arden was asked about taking customers' cart rental fees and putting them into his own pocket in several
6   different ways, and each time he denied doing so, stating he always put the monies into the Unit. When
7   Detective Kastell told him that we had observed him for two hours collecting money from customers and
8   putting the money into his pocket, and giving the carts to the customers without depositing the cash into
9   the Smarte Carte Unit, he said "I have never done that." When Detective Kastell mentioned that the day
10  before 2 witnesses reported observing him do just that, he sat still for a couple minutes, looking out the
11  window, and then said, "Maybe I put $4.00 in my pocket one time, but I think that was to make change."

12     14. Detective Kastell then asked if Mr. Arden would not mind removing all items from his
13  pockets, and he had no objection. His company jacket pockets were empty. Mr. Arden removed a
14  company cell phone, company keys and a few coins from his right front pants pocket; he removed $109
15  from his left front pants pocket, most of it crumpled currency, as if it had been stuffed into his pocket, as
16  opposed to being folded in an orderly fashion. There were 4-$10 bills, 11-$5bills and 14-$1 bills. He
17  said some of the money belonged to him, but he did not know how much. He said he stopped at the
18  ATM on his way to work to get money for his lunch, and denied buying anything after stopping at the
19  ATM. He did not remember how much he had withdrawn from the ATM. When Detective Kastell
20  pointed out to him that ATMs issue $20 bills, of which he had none, and ATMs do not provide $1, $5
21  and $10 bills, he did not respond to that statement.

22     15. Given that both Detective Kastell and I witnessed him taking customers' money (belonging
23  to Smarte Carte), that he had given several evasive answers, that the two customers with whom I spoke
24  confirmed what we observed, and that Detective Kastell had been informed by his supervisor, Ms.
25  Serdyuchenko that he was not supposed to take customers' money and put it into his pocket, and he was
26  not supposed to stay by a single Unit for more than a minute or so, much less two hours, Detective
27  Kastell determined that there was enough evidence to confiscate what appeared to be important evidence
28  of the potential commission of the crime of embezzlement (Penal Code §503.) Accordingly, Detective

1     Kastell took the $109 in currency, counted it out in front of Mr. Arden and me, booked the money into
2     evidence and gave Mr. Arden a receipt. Also, since Mr. Arden had committed this crime in the presence
3     of Detective Kastell and me, Detective Kastell also took his airport security badge, which gave him
4     access to secure areas of the airport not accessible by the general public, as well as the Smarte Carte
5     phone, radio, parking pass and keys. Detective Kastell returned his wallet and the few coins, as they
6     were not evidence, nor jeopardized Airport security. Neither Detective Kastell nor I arrested Mr. Arden,
7     although I believe we had sufficient cause to do so. Detective Kastell advised him that a report would be
8     forwarded to the District Attorney, who would decide whether to file charges, and he would be notified
9     of a court date if and when it was set..

10         16. I was not directly involved in the various discovery requests, nor did I testify in any of the
11     court proceedings, as Detective Kastell was the investigating officer in this matter.

12         17. At all times both Detective Kastell and I followed appropriate police procedures in dealing
13     with this matter. My observations of Detective Kastell in this matter showed no ill will towards Mr.
14     Arden, and Detective Kastell was simply doing as conscientious a job as he could. The allegations in the
15     complaint that he intended to deprive Mr. Arden of his civil rights, and kept exculpatory evidence from
16     him and his attorneys, or that he did anything maliciously or falsely are completely inaccurate.

17         I declare under penalty of perjury that the foregoing is true and correct and executed on October
18     14, 2011 in San Bruno, California.

19

20

21                         Detective John Corkery, Deputy Sheriff

22

23

24

25

26

27

28