CHARLES CARREON (127139)
CHARLES CARREON, ESQ.
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel: 520-841-0835
Attorney for Plaintiff Gary Arden

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

GARY ARDEN,

        Plaintiff,

vs.

FRANK KASTELL, LINARD DAVIS, AIRPORT TRAVEL AGENCY, INC., ALLA SERDYUCHENKO, RON BRIGHAM, SMARTE CARTE, INC., and Does 1 - 10

        Defendants.

Case No.: 3:10-cv-00436 JL

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY OF PLAINTIFF GARY ARDEN

## I. FACTS

Smarte Carte, Inc. ("Smarte Carte") operates a nationwide luggage cart rental business through a system of cart management units ("CMUs") that dispense one luggage cart per $4 cash or credit-card payment. (Arden Dec. ¶ 2.) Smarte Carte operates at San Francisco International Airport ("SFO"). (Arden Dec. ¶ 2.) CMU 30, located outside an entrance to the International Terminal, is the busiest CMU at SFO. (Arden Dec. ¶ 2.)

A surveillance camera is focused directly on CMU 30. (Arden Dec. ¶ 2.) Video from the surveillance camera is recorded on a system operated by the San Francisco Police Department ("SFPD"). (Carreon Dec. ¶ 12.) Video from the surveillance camera is preserved for 2 weeks, and then it is automatically recorded over, and is no longer retrievable. (Carreon Dec. ¶ 11, Exh. 9.) SFPD Officer Ron Hill ("Hill") makes copies of video for police uses, and the videos are viewed with Endura Player software. (R. Hill Depo., Exh. 10, 32:4-10.) SFPD

PAGE 1 OF MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF GARY ARDEN IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF FRANK KASTELL

and officers of the San Mateo County Sheriff Office occupy the same office at SFO. (Exhibit 10, Hill Depo., 20:1-8; Exhibit 3, Kastell Hearing Transcript, 25:23 – 27:25.) Kastell had the Endura software on his computer. (Exhibit 10, Hill Depo., 33:6 - 34:5.) Endura software was introduced to the SFO surveillance system in around 2005. (Exhibit 10, Hill Depo., 62:3-19.) Kastell knew how to use the Endura Player software, and used it repeatedly without asking for assistance. (R. Hill Depo., Exh. 10, 61:10 – 62:6; .) Hill burns videos onto CDs for Kastell when Kastell asks him to. (R. Hill Depo., Exh. 10, 34:6 – 35:7.)

In June 2008, Arden was hired as an Assistant General Manager for Smarte Carte at SFO. (Arden Dec. ¶ 3.) His direct report was General Manager Alla Serdyuchenko. (Arden Dec. ¶ 3.) Before getting his Smarte Carte job, Arden was in training to be a Santa Clara County Corrections officer, from which he had to withdraw due to a physical injury. (Arden Dec. ¶ 3.) Before that, he worked for Covenant Aviation as a manager for the Transportation Safety Administration ("TSA"). (Arden Dec. ¶ 3.)

Arden understood his job with Smarte Carte, and did it well. (Arden Dec. ¶ 4.) No one from Smarte Carte had ever criticized his job performance, or told him not to remain at CMU 30. (Arden ¶ 4.) Arden had been considered for promotion to his own position as a General Manager. (Arden Dec. ¶ 4.) He was in the bonus pool for 2008, and received a performance-based bonus. (Arden Dec. ¶ 4.) Arden relied on the Assistant Terminal Manager job description that Smarte Carte had posted on the Internet in 2008 and 2009 to know the scope of his duties. (Arden Dec. ¶ 4.) The job description described four job duties:
- Assist terminal manager in all aspects of operation.
- Assist in scheduling of staff.
- Ensure all cash handling and paperwork is done properly.
- Ensure excellent customer service.

(Arden Dec. ¶ 4; Exhibit 16.)

As the job description suggests, Arden's people-management duties were essentially limited to scheduling staff. (Arden Dec. ¶ 5.) There was no fixed location from which Arden could have "supervised," Smarte Carte non-managerial employees because they were always on the move, roaming the departure and arrival areas, parking lots, and other passenger-accessible

areas, collecting carts and loading them back into CMUs.  (Arden Dec. ¶ 5.)  There was no one location where Arden could go to keep an eye on them.  (Arden Dec. ¶ 5.)

  CMUs operate in the following fashion.  Smarte Carte employees load the CMUs with carts by sliding the right front wheel into a long track that accommodates a large number of carts.  (Arden Dec. ¶ 6.)  At the front end of the track, a bolt locks the carts in.  (Arden Dec. ¶ 6.)  When a person deposits $4, a computer records the purchase and saves it to the central computer, and the bolt retracts, allowing one cart to be extracted.  (Arden Dec. ¶ 6.)  Arden was entrusted with a circular key that allowed him to unlock the bolt on the CMU, so that he could extract carts from one CMU and redistribute them to another that would sometimes run low due to the fluctuations in business.  (Arden Dec. ¶ 6.)  When the bolt was unlocked, the CMU would not record the extraction of carts as "sales."  (Arden Dec. ¶ 6.)

  Arden "ensured excellent customer service" by assisting customers at the busiest location with the greatest customer service needs, which was at the International Terminal near CMU 30.  (Arden Dec. ¶ 7.)  There were physical issues, language issues, and cash-handling issues to help customers with.  (Arden Dec. ¶ 7.)  Extracting a cart from the typical CMU requires a good, solid tug, and CMU 30 was typical in this regard.  (Arden Dec. ¶ 7.)  Elderly customers, who were quite numerous at the International Terminal where CMU 30 is located, needed physical assistance to extract a cart from the CMU.  (Arden Dec. ¶ 7.)  Smarte Carte CMUs have a small LED display on the front that displays the instructions for customer use in English only.  (Arden Dec. ¶ 7.)  Elderly users had a hard time discerning the words on the display, and many foreign visitors couldn't read the English language.  (Arden Dec. ¶ 7.)  Payment issues arose because Smarte Carte CMUs take one and five dollar bills, and major credit cards only, so customers often need change.  (Arden Dec. ¶ 7.)  Because CMU 30 was the busiest location at the International Terminal, where a large number of customers required assistance, Arden often posted himself at that location.  (Arden Dec. ¶ 7.)

  In order to help people who needed change to rent a cart, Arden made a point of bringing dollars to work.  (Arden Dec. ¶ 8.)  Arden's supervisor Gary Ng knew of and approved of the fact that Arden was helpful to customers and came to work prepared to make change for them.

(Arden Dec. ¶ 8.) When requested by a customer to bring a cart so that luggage could be directly loaded onto it from an arriving vehicle, Arden would advance funds for a cart and then obtain reimbursement from the customer. (Arden ¶ 8.) When circumstances required, it was "proper conduct," for a Smarte Carte employee to take money from a customer and put it for them into the machine. (Arden Dec. ¶ 8; Serdyuchenko Testimony, Exhibit 14, 37:21-38:2.)

During the latter part of December 2008, three Smarte Carte employees were discovered to be subverting the operation of CMUs by keeping the front panels of the machines open and using an internal mechanism to dispense carts without inserting payment. (Arden Dec. ¶ 9.) Kastell obtained surveillance video of the three men and reviewed them with Serdyucheko. (Arden Dec. ¶ 9.) Serdyuchenko also provided computerized reports from CMU 30 and CMU 31 showing a disproportionately low number of automated sales from the units on particular days. (Exhibit 7, Cheung Case Discovery documents, page 000005.) Based on the investigation, on February 10, 2009, Darren Toi Cheung and two other Smarte Carte employees were charged with embezzlement from Smarte Carte (the "Cheung Case"). (Exhibit 6, Cheung Complaint.)

Kastell acted with alacrity when video evidence was requested by the Cheung defendants. On April 9, 2009, Deputy DA Mike Wendler sent a request to the "Airport Police" attaching a letter from defense attorney Douglas Van Vlear requesting *inter alia* "6 CD's containing video of Smarte Carte Unites located outside International Terminal [w]hich is item 1 on Sheriff's property receipt." (Exhibit 7, Cheung Discovery Correspondence, page 000003.) Nineteen days later, Kastell sent DDA Wendler an Investigation Report he had initialed "FK," dated April 28, 2009, attaching "6 CD's consisting of Smarte Carte units located outside the International Terminal" and "Test Cycle Readings [that] pertain to units #30 and #31 whereas [sic] Smarte Cartes were removed from these units that were not rented." (Exhibit 7, page 000005.)

On February 3, 2009, at 6:38 p.m., Arden was working at the International Terminal when Kastell and SMSO Deputy Sheriff John Corkery approached Arden, displayed their badges, and directed him to come with them for questioning, and that he would be free to go after he answered questions. (Arden Dec. ¶ 9.) Kastell testified that he specifically told Arden

that he, not Arden, would determine the length of the interrogation. (Exhibit 3, Kastell Testimony, 44:13-22.) Kastell had not concluded that Arden had committed a crime when he detained Arden, and reached that conclusion only after the interrogation. (Exhibit 3, Kastell Testimony, 46:13-15.) Kastell interrogated Arden in the SFO police station, where the only people present are SMPD and SMSO personnel. (Exhibit 3, Kastell Testimony, 45:2-6.) The door to the police station was locked, and Arden didn't have a key. (Exhibit 3, Kastell Testimony, 45:13-17.) Arden did not believe he was free to go, in part because of the pervasive atmosphere of security at SFO, especially when he was essentially locked into the SFO police station with two armed policemen. (Arden Dec. ¶ 10.) Kastell did not advise Arden of his right to remain silent, or of his right to have an attorney present during questioning. (Exhibit 3, Kastell Testimony, 46:2-12.) Kastell accused Arden of stealing $4 cart-rental fees from Smarte Carte, which Arden adamantly denied. (Arden Dec. ¶ 10.) Kastell told Arden to empty his pockets. (Arden Dec. ¶ 10.) Arden manifested no verbal response to the command, and simply emptied his pockets. (Exhibit 3, Kastell Testimony, 29:19-26.) Arden did not believe he had any choice but to comply with the command to empty his pockets. (Arden Dec. ¶ 10.) Kastell confiscated $109 in cash and Arden's SFO Security Badge, and told him he would be referring the case to the San Mateo County District Attorney ("SMDA") for prosecution. (Kastell's Report, page 8.) Two days later Arden was fired by Serdyuchenko from Smarte Carte because he didn't have a badge. (Arden Dec. ¶ 10; Serdyuchenko Testimony, Exhibit 14, 23:4-10.)

Kastell wrote a police report ("Kastell's Report") on February 10, 2011 that records that he told Arden "that I would be filing this report with the District Attorney and charging him with embezzlement of company funds." (Exhibit 1, Kastell's Report, page 8.) On April 14, 2009, Arden was charged with one count of embezzlement for theft of cart-rental fees on February 2nd and 3rd, 2009. (Exhibit 2, *People v. Arden* Complaint.)

Kastell's Report contains many fabrications that create a false impression that probable cause existed to detain, interrogate, and prosecute Arden, who never stole cart-rental fees from Smarte Carte. Due to that prosecution, Arden was forced to defend himself in *People v. Gary Arden,* San Mateo County Superior Court Case No. NM383977A, from April 14, 2009 until

1  November 20, 2009, when it was dismissed at the request of Deputy District Attorney Sharron
2  Lee with prejudice.  (Arden Dec. ¶ 11; Exhibit 17, Docket Sheet from Case No. NM383977A.)
3  Arden suffered many personal and financial hardships as a result.  (Arden Dec. ¶ 11.)  In addition
4  to the humiliation of being fired, Arden, who was rehired to work as a TSA officer by his former
5  employer Covenant Aviation, suffers severe anxiety from being required to work in a place
6  where Kastell is an important person.  (Arden Dec. ¶ 11.)

7  Kastell testified that Serdyuchenko called him on February 3, 2009 and told him that
8  Linard Davis ("Davis"), the owner of Airport Travel Services, Inc., had told her that he had seen
9  Arden stealing cart-rental fees.  (Exhibit 3,  Kastell Testimony, 9:2 – 10:19.)  Kastell testified
10 that Serdyuchenko had not seen any theft directly with her own eyes.  (Exhibit 3, Kastell
11 Testimony, 34:5-7.)  Kastell said Davis told him that "he had been informed there was a theft of
12 money going on with a Smarte Carte employee."  (Exhibit 3, Kastell Testimony, 34:23-26.)

13 Regarding this aspect of Davis's statement, Kastell's Report states: "W# 2 Fernando who
14 is a skycap told Davis that he was not too happy with what is going on outside and the fact that
15 an employee for Smarte Carte is renting Smarte Cartes to would-be passengers and putting the
16 rental fees in his pocket."  (Exhibit 1, page 3.)  However, Davis denied telling Kastell that
17 Romeo Fernando ("Fernando") had complained to him about Arden stealing money from Smarte
18 Carte:

> Q. Did you talk with Mr. Romeo Fernando before proceeding to
> the smoking area, do you recall?
> A. I can't recall.
> Q. Had he complained to you at all about Mr. Arden?
> A. You know, I listen to people talk, you know.  But when you say
> "complain," in what way complaining about.
> Q. About, for example, Mr. Arden doing anything that interfered
> with Mr. Fernando making money?
> A. No, no.
> Q. Any complaint about Mr. Arden taking money from Smarte
> Carte customers and not putting it into the machine?
> A. No.
> (Exh. 12, Davis Depo.,  97:7-21.)

Regarding Fernando, Kastell's Report states, at page 5:

> "As we continued to watch this employee, I spotted witness # 2
> who just finished helping a customer at the ticket counter. I asked

> this witness if he noticed the employee working the Smarte Carte unit. He said yes and he is stealing money. I asked what he meant by that statement? He told me he is a skycap working with a large metal cart waiting for passengers who have a large amount of luggage. Since the A side is busy during this time of the day, he walks back and forth in this area. While working this area, he has watched passengers approach this man, give him 4 dollars and he would give them a Carte. He would then put the money in his pocket instead of the machine.
>
> Witness # 2 said day evening (02-02-09) he watched the same man put money in his pocket at least 5 different times never giving passengers Cartes. He never put any money into the unit. This Witness was very upset because he said this man was stealing money the same way the other three managers were stealing money from the company. He further said with regards to stealing money, this man is worse than the other three managers put together."

Fernando adamantly denied making speaking to Kastell at all about Arden, and further stated that he had never seen Arden steal:

> Q. Mr. Fernando, in the last two years or so, have you ever had a conversation with Detective Kastell about you seeing Mr. Arden pocket some money while he was at the airport?
> A. I don't remember. It's a long time ago but I never see this guy pocketing money, no.
> Q. You never saw him do that?
> A. No.
> * * *
> Mr. Carreon: Excuse me. Can I interject one thing. Let the record reflect that when Mr. Fernando spoke the words 'this guy' he looked to his right and Mr. Arden is directly to his right.
> (Exh. 13, Fernando Depo. 21:6-20.)
>
> "Q. Okay. Now again referring to that page in the report that's numbered 5, let me read something to you. I should also tell you that in the report, you are mentioned and you're given a title, and the title is 'Witness 2.' [Counsel then reads the above-quoted section to Fernando, as reported at pages 23 – 26 of the deposition transcript before resuming the following questioning.]
> (Exh. 13, Fernando Depo. 23:6 - 25:6.)
>
> Q. All right. Kastell is saying he's documenting what he claims you told him. Did you ever tell him that you saw Mr. Arden pocket $4 after a passenger gave him that money?
> A. No, I – I never said to Mr. Kastell about that, you know.

> Q. I'm sorry?
> A. I never say anything to Mr. Kastell about that, you know.
> Q. The report goes on, this is another paragraph, 17 again it says, "Witness #2," which is you, "said on 18 Monday evening," which would be the day before, "on Monday evening, February 2, '09, he watched the same man 20 put money in his pocket at least five different times after giving the passengers carts."
> Q. Did you tell Kastell that?
> A. No, I never -- I cannot -- you know, what Mr. Kastell say about that, you know, I never say that this guy is, you know, pocketing money. I never say to Mr. Kastell about that.
> (Exh. 13, Fernando Depo., 24:16 – 25:1.)
>
> Q. Did you ever have a conversation with Mr. Davis about Mr. Arden pocketing money?
> A. Same thing. I never tell – I never say anything, you know, that those – this guy's pocketing money.
> Mr. Carreon: Let the record reflect that again the witness has looked to his right towards Mr. Arden when he said "this guy."
> (Exh. 13, Fernando Depo., 26:19 - 27:1.)

Thus, all of the statements in Kastell's Report attributed to Fernando are impeached by the testimony of both Davis and Fernando, who both deny telling Kastell that Fernando had seen Arden stealing.

Kastell overstated what Davis actually told him. Kastell's police report attributes the following statement to Davis:

> "He observed passengers arrive in vehicles, exit their vehicles, and walk to the Smarte Carte unit. As they approached for a Smarte Carte, this employee pulled out a Smarte Carte from the track, collected the rental money from the passenger, gave the passenger the cart, and then put the money in his front-left front pant's pockets. Four times .... during the time he watched this Smarte Carte employee assist four to five different passengers as they approached the unit for a cart.... He did not observe him put any money in the unit, just in his pocket."
> (Kastell's Report, page 3.)

In fact, Davis denied seeing Arden take fees from more than one person, and testified that the only thing he had seen Arden do was sell one cart to a "Filipino lady." (Exh. 12, Davis Depo., 90:7-16.) Davis was unsure whether he had seen Arden put money in the machine. (Exhibit 12, Davis Depo. 93:14-16; 93:25 – 94:2.) Davis denied telling "Ms. Serdyuchenko that

Mr. Arden was stealing," responding "No, I never used that term." (Exhibit 12, Davis Depo., 93:8 – 10.)

Kastell's prior testimony contradicts the declarations he and Corkery have submitted in support of this motion. *Corkery avers* at paragraph 8 of his declaration:

> "*I spoke to two different customers,* after they had walked into the terminal. I inquired whether they had given money to Mr. Arden, and they each told him they had given him 4-$1 bills, and he gave them a cart."

Addressing the same topic, *Kastell avers* at paragraph 9 of his declaration:

> "At some point, *Detective Corkery spoke to two different customers,* after they had walked into the terminal, He inquired whether they had given money to Mr. Arden, and they each told him they had given him 4-$1 bills, and gave them a cart."

*But Kastell previously testified* under oath, on October 16, 2009 that *he was the one* who talked to two people on February 3, 2009:

> Q. … In your report I think you said that *you spoke to some passengers* that you said you had observed get a cart from Mr. Arden … is that correct?
> A. That is correct.
> Q. Okay. And *would you recognize those passengers* again if you saw them on a video?
> A. I don't believe so.
> A. Okay. And you didn't get their names or anything?
> A. No.
> (Exhibit 3, Kastell's Testimony, 42:14-25.)
>
> Q. … *You had spoken with some of the passengers* whom you had seen give money to the defendant?
> A. Yes.
> Q. When you spoke to them, *do you recall what they said*?
> A. *They told me they wanted a cart. They gave the man the four $1 bills and he gave them the cart and they walked away with the cart.*
> Q. Did any of the passengers you speak to tell you whether they saw the man put the money in his pocket?
> A They were not close to the machine at all and they never observed him putting any money into the machine.
> (Exhibit 3, Kastell's Testimony, 52:11-23.)

Even Kastell's statement that he talked with Serdyuchenko on February 3, 2009 to confirm that Arden was stealing based on his claimed observation has been discorroborated by

Serdyuchenko, who testified that she did not have any such conversation with him. Kastell's report, referring to Serdyuchenko as "RP," states:

> "I placed a call to the RP's cell phone … She said that his orders are to check all units in the airport and see that the other employees are doing their job. It is against company policy to work a unit in this way and if he is putting money in his pocket, he is stealing from the company."
>
> (Kastell's Report, Exhibit 1, page 5.)

On July 29, 2009, Serdyuchenko testified at a hearing in before ALJ A. Becerrill in a proceeding entitled Gary A. Arden vs. Smarte Carte, Inc., before the California Unemployment Insurance Appeals Board concerning this matter. Examined by Arden, she testified as follows:

> Q. So you never had a communication with Detective Kastell on the 3rd when my badge was taken away?
> A. I never had.
> ***
> Q. So on February 3rd, who did Detective Kastell call to have my badge removed?
> A. I don't know.
> Q. So Detective Kastell basically removed my airport SIDA badge on his own observations?
> The Court: She said she doesn't know.
> Q. SO you don't know. Okay. Did he tell you that same night that my badge was revoked or taken away, did he tell you to come to the airport?
> A. I hadn't spoken to him on 3rd.
> (CUIAB Transcript, Exhibit 14, 26:21 - 27:21.)

Kastell's theory of Arden's *modus operandi* was: (a) Arden would unlock the mechanism that keep carts locked into the CMU and prevents their being dispensed without payment by cash or credit card, (b) Arden concealed the presence of the keys sticking out of the back of the machine by hanging his jacket over the CMU, (c) Arden took money from customers and put it in his pocket, (d) Arden dispensed carts from the unlocked CMU to customers, (e) at no time did Arden deposit any money into the CMU. (Exhibit 3, Kastell's Testimony, 42:26 – 43:6.) Kastell tendered his own direct observations to establish this *modus operandi*. (Kastell's Report, generally.)

1        Kastell's own personal "observations" are impeached by video surveillance evidence.

2 This statement is impeached by the surveillance video from February 3, 2009 (the "February 3rd

3 Video"), submitted to this Court on DVD with a Notice of Manual Filing (Docket # 71).   The

4 February 3rd Video starts at 4:30 p.m., and continues until shortly after 6:38 p.m., when Kastell

5 and Corkery detained Arden.  (Arden Dec. ¶ 12.)  Kastell's Report states that at "no time did this

6 employee place the money in the unit."  (Exhibit 1, Kastell's Report, page 4.)  The video shows

7 Arden repeated placing money in the unit, immediately after receving it from customers.  (Arden

8 Dec. ¶ 12.)  Kastell testified that he saw Arden use the unlocked CMU to extract a cart, take

9 money and hand the customer the cart at least six times.  (Exhibit 3, Kastell's Testimony, 18:15 –

10 19:13.)   In fact this never occurred – on all but one occasion, every time Arden gave a cart to a

11 customer, the February 3rd Video shows that he received the money beforehand and used it to

12 purchase the cart.  (Arden Dec. ¶ 12.)  On one occasion, Arden used his own money to get a cart

13 for a customer, then the customer refused to accept the cart, so he gave it to another customer

14 and reimbursed himself the $4 he had advanced for the benefit of the would-be customer.

15 (Arden Dec. ¶ 12.)  This exchange appears on the February 3rd Video, that has a digital

16 timekeeping device that displays a 24-hour clock, between 18:15:00 hours and 8:17:40 hours.

17 (Arden Dec. ¶ 12.)

18        Throughout its entire length, the February 3rd Video shows Arden providing excellent

19 customer service, including numerous occasions when he took money from customers, put it in

20 the machine for them, pulled out a cart, and gave it to them.  (Arden Dec. ¶ 13.)  At no time did

21 Arden retain any cart-rental fees for himself.  (Arden Dec. ¶ 13.)  At no time did her perform

22 "rapid hand gestures" to simulate depositing money while actually pocketing the funds.  (Arden

23 Dec. ¶ 13.)  Arden has no sleight-of-hand abilities that would enable him to conceal money from

24 a person standing beside, in front of, or behind him.  (Arden Dec. ¶ 13.)  The Court is

25 respectfully requested to utilize the Endura Player software that is on the disk to view the video,

26 which is the larger of the two files on the DVD.  The second file records the time period during

27 February 2, 2009, when Kastell claims Davis told him he saw Arden stealing cart-rental fees.

28

Larry Needham's declaration[1] that purports to interpret what appears on the video does not accurately summarize the video evidence. (Arden Dec. ¶ 13.)

It is obvious that under Kastell's theory of Arden's *modus operandi*, Arden had to be keeping CMU 30 unlocked. Because of the importance of this "key evidence," in the underlying criminal proceeding, Kastell testified unequivocally that he saw Arden ***remove the key from CMU 30 and put it in his pocket***:

> Q. What happened next?
> A. … he removed the jacket from the unit, put the jacket on, removed the key, put the key in his pocket. All the while I still had a view of him. I walked in and spoke with Detective Corkery, at which time both of us then approached Mr. Arden and asked him if he would come upstairs…."
> (Exhibit 22:19-26.)

> Q. Now, during the times when Mr. Arden went inside, did you see him remove the keys that you believe you saw him put into the back of the unit? Did you see him ever take them out?
> A. At the end of the investigation, yes.
> (Exhibit 3, Kastell's Testimony, 43:7-11.)

The video discorroborates this testimony, because Arden is never seen to be using a key. Aware of this fact, Kastell has impeached himself in his declaration submitted in support of this motion (Docket # 70-1) by averring at paragraph 11:

> "At one point, Mr. Arden removed his jacket draped over the back of the Unit; the act of grabbing his jacket should have taken a second, but he kept his hand behind the Unit for nearly 8 seconds, which would be consistent with him taking our or inserting the special key."

Kastell did not rely upon the theory that eight-seconds is too long a time to put on a jacket when he detained Arden on February 3rd, nor does the "eight-second" observation appear anywhere in Kastell's Report. (Exhibit 1, generally.) Indeed, it is apparent that Kastell has now

---

[1] Of course, none of what Needham states in his declaration could have been known to Kastell before he detained, interrogated, searched, and fabricated evidence to falsely charge Arden with embezzlement, and thus is necessarily irrelevant to Kastell's conduct, knowledge, good faith or motivations, and thus has no relevance to the pending motion. For additional reasons set forth hereinbelow, the Needham declaration should be disregarded.

watched the video, discovered that it discorroborates his claim that he saw Arden pull the key from CMU 30 and pocket the key. He has now counted the seconds in order to fabricate new grounds for claiming he had probable cause to detain Arden. Kastell enlisted Corkery to repeat the "eight-second" observation, as if the two really had known of this marginally-relevant factoid on February 3rd. (Corkery Dec. ¶ 10, Docket # 70-2.)

Immediately after Arden was charged with embezzlement, on April 22, 2009, his defense attorney requested all available surveillance videos in discovery. (Exhibit 4.) After various further exchanges, on May 28, 2009, DDA Tara Heumann sent Arden's defense counsel an email stating that she had "sent a goldenrod request for follow-up materials to Detective Kastell at the Airport Bureau" specifically requesting "all video recordings related to the case." (Exhibit 5.) In marked contrast to the alacrity with which Kastell responded to the request of DDA Wendler in the Cheung Case, as recited above, Kastell never did provide the video in a viewable format. (Exhibit 8.) As of September 25, 2009, Kastell was still playing hide-the-ball with DDA Sharron Lee, who wrote him an email requesting a viewable copy of the video:

> "I the mean time, can you please tell me who I can contact about the video surveillance. Our tech people have not been able to play it on any of our computers. I think at this point, it may be the software as opposed to the actual footage, but I can't confirm that until we can get the software running. What I' really like What I'd really like to know is whether it can be converted to some other media format like a wave doc. Can you please help me b/c I really need to get this sorted out before that 10/16 date.
> Thanks!
> Sharron"
> (Exhibit 8.)

Although Kastell clearly knew how to provide viewable videos to DDA Wendler in the Cheung Case, he deflected DDA Lee's urgent request for assistance by booting the matter over to SFPD Hill:

> "Most of the cameras located at the airport are under the direction of Officer Ron Hill of the San Francisco Police. His telephone number is 650-821-7055."
> (Exhibit 8.)

PAGE 13 OF MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF GARY ARDEN IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF FRANK KASTELL

Arden's counsel, who had already moved to compel production of the surveillance videos, finally received a viewable copy of the February 2nd and February 3rd Videos a few days before the October 16, 2009 suppression hearing that DDA Lee was referring to in her email of September 25, 2009, quoted above. (Carreon Dec. ¶ 19.) Because the February 2nd and February 3rd Videos were entirely exculpatory, Arden's defense counsel obtained an Order requiring the SMDA to produce all video recordings from February 2nd and February 3rd showing Arden working near CMU 30. (Carreon Dec. ¶ 19.) Shortly after the Court entered the Order, the SMDA disclosed that all of the remaining video from February 2nd and February 3rd had been recorded over. (Carreon Dec. ¶ 19; Exhibit 9.) Arden's defense counsel then moved for dismissal of the case under the *Youngblood-Trombetta* doctrine, that would have required the trial judge to determine that the taped-over video was in fact exculpatory. (Carreon Dec. ¶ 19.) In order to carry the burden of showing that the destroyed video was exculpatory, Arden's defense counsel was ready to show Superior Court Judge Gerald Buchwald the February 2nd and February 3rd Videos. (Carreon Dec. ¶ 19.) On the morning of November 20, 2009, when the hearing on Arden's *Youngblood-Trombetta* motion was to take place, the SMDA dismissed the action with prejudice. (Carreon Dec. ¶ 19.) The docket reports that it was dismissed "in the interests of justice." (Exhibit 17.) A transcript of the hearing where Ms. Lee conveys Judge Buchwald's bemusement at the surprising turn of events, that Ms. Lee attempted to finesse as a "failure to prosecute." (Exhibit 18.) After the conclusion of the case, Ms. Lee promptly sought to reward Smarte Carte for being "cooperative" during suppression hearing by giving "a copy of the airport surveillance video surveillance CD to their attorney…." (Exhibit 19.)[2]

---

[2] Exhibit 19 is an email from Ms. Lee to her boss Sean Gallagher, offered for impeachment of Ms. Lee for bias.

## II. ARGUMENT

### B. Arden Has Presented Significant Probative Evidence to Support The Complaint

Arden has presented "significant probative evidence tending to support the complaint," and therefore summary judgment must be denied. *Barnett v. Centoni,* 31 F.3d 813, 815 (9th Cir. 1994.) "Section 1983[5] requires a claimant to prove (1) that a person acting under color of state law (2) committed an act that deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer v. Murphy,* 844 F.2d 628, 632-33 (9th Cir.1988). "A person deprives another `of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains].'" *Redman v. County of San Diego,* 942 F.2d 1435, 1440 (9th Cir. 1991), *quoting Leer v. Murphy,* 884 F.2d at 633 (citation omitted). Detentions and series of the person and property are actionable under 42 U.S.C. § 1983. *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 395-396 (1971). The use of false evidence to procure and continue a prosecution is likewise actionable under Section 1983. *Buckley v. Fitzimmons,* 509 U.S. 259, 273 (1993); *Genzler v. Longanbach,* 410 F.3d 630 (9th Cir. 2005); Misltein v. Cooley, 257 F.3d 1004 (9th Cir. 2001).

An unlawful detention can give rise to liability under Section 1983 as a matter of law. *Eg. Morgan v. Woessner,* 997 F.2d 1244, 1252, note 3 (9th Cir. 1993). Arden has presented facts that would warrant a jury in finding that Kastell detained Arden without reasonable cause, because all of the purported witnesses whose statements are misrecorded in Kastell's Report have sworn under oath they didn't tell Kastell the things he attributed to them in Exhibit 1. Arden has presented enough evidence to prove to a preponderance that Kastell seized Arden unlawfully by telling Arden that he would be free to go after he answered some questions. Kastell made it clear to Arden that he was not in fact free to go by telling him he that he would determine the length of the interrogation. Taking a person into custody in order to encourage them to engage in "voluntary" interrogations is a violation of the person's Fourth Amendment rights. The Ninth Circuit "has consistently recognized that a person detained pursuant to

*Terry[v. Ohio]* is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest." *Carey v. Nevada Gaming Control Board,* 279 F.3d 283, 882 (9th Cir. 2002).

Kastell can be also be held liable for unlawfully seizing Arden's $109 without a warrant and without any probable cause to believe that the money was evidence of a crime. It is frankly preposterous to imagine that after having been questioned without a lawyer for in a locked room with two armed police officers about things he hadn't done, that Arden would be seriously disposed to voluntarily surrender $109 in US currency that Arden had just spent the last hour denying that he stole. Nor is it possible that Arden would voluntarily give up his SFO Security Badge, for he promptly lost his job into the bargain!

Kastell's totally refusal to provide the District Attorney's Office with the Endura Player, thus preventing three Deputy DAs – Kathy Rogers, Tara Heumann, and Sherron Lee – from seeing the exculpatory video, worked as an engine of injustice to thrust Arden out of his job and propel a malicious prosecution from April to November, costing Arden over $40,000 in defense fees and costs, and great misery. (Arden Dec. ¶ 11.)

By concealing the February 2nd and 3rd Video, misstating his own observations, and fabricating statements that he falsely attributed Fernando, Davis, and Serdyuchenko, Kastell violated Arden's constitutional rights. If, by some miracle, a jury believed that Kastell did not understand that the Endura Player software was necessary to view surveillance video, the same jury would inevitably find that he was plainly incompetent with regard to an important job duty.

**B.     OBJECTIONS TO EVIDENCE**

The declarations of Kastell and Corkery both state that Corkery was the one who talked with two witnesses about getting carts from Arden. These declarations have been impeached by Kastell's prior testimony that *he was the one who* interviewed the two people. A witness false in part may be disregarded as to all of his averments. The Court is requested to disregard or view all of the Kastell and Corkery averments with suspicion as inherently untrustworthy and incapable of taking any matter out of dispute. Similarly, Kastell has backed off from his former testimony that he clearly saw Arden remove the key from CMU 30 and put it in his pocket. Now

PAGE 16 OF MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF GARY ARDEN IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF FRANK KASTELL

both Kastell and Corkery count the seconds while Arden puts on his jacket, in order to cover up the fact that the February 3rd Video never shows Arden pulling a key out of CMU 30, or putting any key in his pocket. Kastell, who once was claimed he hadn't seen Arden deposit any money into CMU 30, even once, now claims to have seen Arden repeatedly engaging in "rapid hand gestures" that only he and Corkery could see were merely a ruse so that "someone standing behind him might think he was depositing cash into the unit. The declarations of Corkery and Kastell have no credibility whatsoever and should be simply disregarded.

The Needham Declaration is a completely inaccurate and irrelevant, because whatever it states was unknown to Kastell and could not have affected his probable cause calculus. (Arden Dec. ¶ 13.) "Probable cause existed if 'at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [plaintiff] had violated [a criminal statute]." *Hunter v. Bryant,* 502 U.S. 224, 228 (1991) (emphasis added), *quoting Beck v. Ohio,* 379 U. S. 89, 91 (1964). Further, as a witness associated with Smarte Carte, it is clear that Needham is biased. Smarte Carte and DDA Lee have been collaborating to work against Arden since 2009. As soon as she dismissed the Arden Criminal Case, Ms. Lee emailed her boss to ask if she could send a copy of the February 3rd and February 4th Videos to Smarte Carte's attorney, because Smarte Carte had been so helpful during the suppression motion, and was now having to engage in civil litigation with Arden and his "jerk defense attorney." (Exhibit 19.)

With regard to Ms. Lee's own declaration, it is also clear that her judgment is tainted by resentment, and her declaration, attempting to argue that Kastell had done nothing to delay her or Arden's acquisition of viewable surveillance videos, has no probative value with respect to this motion, and should be disregarded.

C.  **KASTELL IS NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW**

The test for determining whether a defendant enjoys qualified immunity has two prongs: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right, and (2) was that constitutional right clearly

established in the context faced by the defendant? *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  The foregoing analysis establishes that Kastell could be held liable for violating Arden's civil rights under various theories.

With regard to the second aspect of the doctrine, a reasonable jury could determine by a preponderance that, since Kastell created his case against Arden out of whole cloth, he could not have reasonable cause to detain Arden, nor could he have reasonably believed that Arden's $100 and SFO Security Badge were evidence of crime, nor could he have probable cause to warrant the delivery of a knowingly false police report.  The rules of probable cause and reasonable detention are well established.  Likewise the prohibition against fabricating evidence is as old as the courts themselves.  Accordingly, Kastell is not entitled to judgment as a matter of law on qualified immunity.

Dated:  October 31, 2011                     CHARLES CARREON, ESQ.

                                             s/Charles Carreon/s
                                             CHARLES CARREON (127139)
                                             Attorney for plaintiff Gary Arden